**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LUCIANA PULASKI**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 5634 |
| v. | ) | |
| | ) | Magistrate Judge |
| **MICHAEL J. ASTRUE**, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Luciana Pulaski ("Plaintiff" or "Pulaski") seeks judicial review of a final

decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"),

denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act. Before this Court is Plaintiff's Motion for Summary Judgment. The parties have

consented to have this Court conduct any and all proceedings in this case, including entry of

final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, the

Court finds that the motion should be granted.

## I. Legal Standard

In order to qualify for SSI or DIB, a claimant must demonstrate that he is disabled. An

individual is considered to be disabled when he is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id.* Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. First, the SSA considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(4)(I). Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii). Third, the SSA compares the impairment to a list of impairments that are considered conclusively disabling. 20 C.F.R. § 404.1520(4)(iii). If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id.* Fourth, the SSA assesses the applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv). In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience. 20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971). The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## II.  Procedural History

Plaintiff, a resident of California, filed an application for disability benefits on April 18, 2008, alleging that she became disabled as of June 4, 2007. The Social Security Administration ("SSA") denied the claim initially and again on reconsideration, following which a hearing was held in Downey, California before administrative law judge ("ALJ") David Marcus on December 9, 2009. Pulaski was represented by counsel. On January 4, 2010, the ALJ denied Pulaski's claim. She sought review by the Appeals Council, which denied the request on June 22, 2011. The ALJ's opinion then became the Commissioner's final decision, and Pulaski filed the instant action on August 18, 2011.

## III.  Factual Background

### A.  Medical Evidence

Pulaski was born on December 18, 1969 in Brazil and was thirty-nine years old when she filed for disability benefits. She appears to have arrived in this country at some point around

1997.  (R. 203.)  Although some medical documents from Brazil are evidenced in the record, they are untranslated from Portuguese.  Pulaski states in a written submission that she fell at the age of one and broke her left leg.  (R. 130.)  She was taken to a clinic, where her leg was placed in a cast.  (*Id.*)  Taken as a whole, the medical record shows that Pulaski experienced problems in her left leg that stemmed from her childhood injury.

The record is undeveloped for the majority of the time prior to December 12, 1997, when Pulaski consulted Dr. Jay Loftsgaarden at the Midelfort Clinic in Eau Clair, Wisconsin.  Pulaski denied having any pain at that time, but she was interested in improving the strength of her left leg.  (R. 203.)   Upon examination, Dr. Loftsgaarden noted that Pulaski had hypermobility in her left hip, with increased internal rotation and extension due to atrophy to the left hip flexors and quadriceps.  Her left leg was also shorter than the right by 3 cm.  (*Id.*)  Her left quadriceps showed "marked wasting" and did not respond to a pinprick or light touch.  (R. 203-04.)  Her walking displayed some minor "hip hiking" in which she threw her weight forward.  (R. 204.)  Dr. Loftsgaarden noted that she suffered from "significant weakness" in her left lower leg, especially the hip flexors and quadriceps.  (R. 203.)  Pulaski reported that she had undergone two prior knee surgeries.  Although the nature of these operations was unclear, Dr. Loftsgaarden concluded they must have been to release her hamstring.

A radiology report confirms that Pulaski had a mild narrowing of the left hip joint, though with no osteophytes, subluxation, or erosive changes.  (R. 207.)  Her left knee bones were slightly atrophic in comparison with the right, and the musculature was not as prominent.  (*Id.*)  A nerve conduction study concluded that Pulaski suffered from femoral neuropathy, with a probable sciatic nerve injury of mild degree.  (R. 205.)  Dr. Loftsgaarden recommended physical

therapy, which Pulaski completed.  The exercises did not activate her left quadriceps, but she experienced increased strength in the lower right leg.  (R. 206.)  Dr. Loftsgaarden concluded that her condition had been caused either by the childhood fracture or by the casting that was applied to remedy her injury.  (*Id*.)

On June 25, 2007, Pulaski consulted neurologist Dr. Paul Helfgott concerning pain in her leg, neck, and shoulders.  Pulaski complained that sitting or standing too long would create numbness in her hands and feet, and that she frequently experienced "popping" in her neck and shoulder.  (R. 199.)  Dr. Helfgott also noted that Pulaski's left leg was 3 cm. shorter than her right, her left calf circumference was 2 cm. smaller than the right, and her thigh circumference was 10 cm. shorter on the left.  (R. 200.)  She also showed some scoliosis in her spine, though a MRI study revealed an "unremarkable" cervical spine.  (R. 221.)  As for strength, Dr. Helfgott determined that her left hip flexors and quadriceps were a two out of five, adductors were zero out five, and abduction was a full five out of five.  However, Plaintiff was seen to ambulate asymmetrically, with pronounced difficulty in using hip flexion strength to bring her leg forward when walking.  (R. 200.)  Dr. Helfgott concluded that "aggressive intervention" was not called for, and that Pulaski most probably suffered from a fixed lesion that would require physical therapy.  (*Id*.)  Dr. Loftsgaarden largely concurred with this plan on October 21, 1998, when he noted that Pulaski should continue with her current exercise on a stationary bicycle, and that further strengthening was unlikely to lead to additional improvement in her quadriceps.  (R. 223.)  On June 27, 2007, Pulaski also saw Dr. Ali Hafezi at the Spine Center of Presbyterian Intercommunity Hospital in Whittier, California.  She complained primarily of pain in her right buttock, both knees, and elbows.  (R. 261.)  Pulaski reported that she was not in severe pain, but

that she was uncomfortable when standing and walking for long periods of time. Pulaski did not present her nerve conduction study to Dr. Hafezi, reporting instead that Dr. Helfgott had explained that she may have suffered some nerve damage in her thigh. (*Id*.) Dr. Hafezi told Plaintiff that any damage that existed to her nerves was not reversible. (R. 262.) After finding that she had some scoliosis in her lumbar spine, Dr. Hafezi concluded that her MRI did not suggest that she was a candidate for narcotic pain medication, and he prescribed physical therapy instead. (*Id.*) She reported to him on August 28, 2007 that the therapy had helped, and documents supplied by the physical therapist confirmed this report. (R. 283.) Dr. Hafezi recommended that she continue with "conservative management." (R. 219.)

In the fall of 2008, Plaintiff underwent another round of radiological and neurological testing. A nerve conduction study performed by Dr. Helfgott on September 15, 2008 shows that she had no active nerve disease, though there was clearly a diffuse loss of motor units on the left side. (R. 380.) A significant asymmetry in the distal latency of her femoral motor nerves was seen, with ten percent less amplitude on the left than on the right. (*Id*.) A MRI showed a slightly tilted right pelvis. Possible ovarian cysts were noted, but the exam was otherwise normal. (R. 373.) A MRI of the right knee indicated only some mild bruising and a small joint effusion. (R. 374.)

On December 3, 2009, Dr. Hafezi issued a RFC Questionnaire concerning Plaintiff. Dr. Hafezi noted significant restrictions in her ability to sit, stand, and walk. He determined that she was able to sit for only three hours at a time, stand for one hour, and walk for less than thirty minutes at a time. (R. 400.) During the course of an eight-hour day, Pulaski was found to be restricted to sitting for a total of five hours, standing for two, and walking for one. She could lift

and carry up to ten pounds frequently, could lift up to twenty pounds occasionally, but could never carry more than ten pounds at a time. (*Id*.) Dr. Hafezi concluded that she could also never crawl, climb, squat, stoop, crouch, or kneel.[1]

### B. State Agency Physician

On June 17, 2008, state agency physician Dr. Padma Talcherkar issued a physical RFC assessment concerning Pulaski. Dr. Talcherkar found that Pulaski could stand, sit, and walk six hours during a workday, lift ten pounds frequently and twenty pounds occasionally, and had an unlimited ability to push and pull. (R. 301.) Plaintiff was found to be completely unable to stoop, and her capacity for kneeling, crouching, and crawling was found to be occasional. (R. 302.) As part of her assessment, Dr. Talcherkar found that Pulaski's statements were only partially credible when compared to the medical record, and she concluded that Plaintiff should be limited to light work. (R. 306.)

### C. Hearing Testimony

Pulaski appeared at the hearing with her attorney and gave testimony to the ALJ. She described herself as five feet, three inches tall and weighing 120 pounds. Plaintiff stated that her pain level increases if she gains additional weight. (R. 51.) Pulaski has sought a number of different jobs as a result of the pain she experiences, and she last worked in June 2007 as a

---

[1] In an earlier RFC evaluation dated June 27, 2007, Dr. Hafezi found that Plaintiff could work only six hours a day, could stand no more than two hours at a time, and could never bend, squat, or twist. (R. 319.)

quality control specialist at a plastic and foam company.[2]  (R. 47.)  She has sought a number of

different jobs as a result of pain.  (R. 49.)   According to Plaintiff, she quit her last job because of

"discomfort" she experienced in her neck, hips, knees, and legs.  (R. 48.)  She was no longer able

to stand all day without experiencing significant pain, so she decided to quit to pursue medical

treatment.  (R. 47-48.)  At the time she was working, Pulaski was only taking over-the-counter

medication, but she is currently taking the prescription medications Lyrica and Vicodin

(hydrocodone).  She stated that these medications helped manage her pain, but they did not get

rid of it entirely.  (R. 48.)  However, they make the pain "tolerable" despite the side effects of

stomach pain and sleepiness that they bring on.  (*Id.*)  As a result, she takes her medication in the

evening.  (R. 55.)

Pulaski testified that she walks with a cane, though she was not using it at the hearing.

She also stated that Dr. Hafezi told her to obtain a leg brace, which she had ordered but not yet

received.  (R. 56.)  Pulaski experiences tingling in her feet, and she must put her legs up in the

air to relieve it.  (R. 52.)  As a result of her orthopedic problems, Pulaski stated that her activities

of daily living were restricted.  Although she swims and rides a stationary bike, she does not

engage in heavy vacuuming or gardening, and she does housework throughout the day rather

than all at one time.  (R. 50-53.)  She can only be active up to twenty minutes at a time and must

rest almost half of the day.  (R. 53.)  She remains active only about two hours out of a normal

day.  Her condition has worsened over the years, especially as it concerns her shoulders.  (R. 54.)

---

[2]  The record shows that Pulaksi held that position for the first six months of 2007.  Prior
to that she worked as an (unspecified) assistant from June 2005 to October 2006, as an
interpreter from August 2004 to August 2005, and as a janitor from November 1998 to August
2004.  (R. 136.)

She tends to fall about three times a year.  (R. 58.)  Partially for that reason, Pulaski claimed that

Dr. Hafezi recommended that she use an electric wheelchair when performing some tasks such

as grocery shopping, but she does not like to do so because people "give me the eye."  (R. 57.)

Pulaski testified that she had no hobbies, though she does like to visit friends.[3]  (R. 59.)


### D.      The ALJ's Decision

ALJ Marcus issued his decision denying Pulaski's claim on January 4, 2010.  Following

the required five-step evaluative process, Marcus found at step one that Pulaski had not engaged

in substantial gainful activity since her alleged onset date of June 4, 2007.  (R. 31.)  He

determined at step two that she suffered from the severe impairments of "chronic left leg

weakness/femoral nerve palsy," scoliosis, and low back pain secondary to "overuse syndrome."

(R. 31.)  None of these impairments, either considered singly or in combination, were found to

meet or medically equal a Listing at step three.  (R. 31-32.)  Before moving to step four, the ALJ

found that the opinions of Pulaski's treating physician, Dr. Ali Hafezi, were entitled to

"significant" but not "controlling" weight.  (R. 33-34.)  Pulaski's own testimony concerning the

extent of her impairment-related symptoms were also found not to be credible to the extent that

they conflicted with the ALJ's RFC decision.  (R. 33.)  As for the RFC itself, the ALJ found that

Pulaski could perform less than a full range of sedentary work.  She was limited to lifting and

carrying ten pounds occasionally, and between five and ten pounds frequently.  Her ability to

stand and walk were limited to two hours a day, with the option to use a cane, and she was found

---

[3]  Testimony was also given by vocational expert Freeman Leeth.  As Pulaski does not object to any part of the ALJ's decision related to Leeth's testimony, the Court omits a summary of his hearing statements.

able to sit for six hours each workday. Climbing ladders, ropes, and scaffolds were precluded entirely, and Pulaski was found to be able to climb stairs, balance, stoop, kneel, crouch, and crawl only occasionally. (R. 32.) Based on this RFC, the ALJ determined at step four that Pulaski was unable to perform her past relevant work. (R. 35.) After questioning the VE, the ALJ concluded at step five that Pulaski could perform jobs that are available in the national economy in substantial numbers and that, as a result, she is not disabled. (R. 35-36.)

## IV. Discussion

Pulaski objects to the ALJ's decision on three grounds. According to her, the ALJ erred by: (1) failing to assess her credibility properly; (2) not giving controlling weight to Dr. Hafezi's opinion; and, (3) incorrectly assessing her RFC.

### A. The Credibility Issue

ALJ Marcus concluded that Pulaski's statements concerning the symptoms she experiences were not fully credible. (R. 33.) Plaintiff argues that this assessment is incorrect because it relied on an improper legal standard and failed to comply with the requirements of SSR 96-7p. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (stating that an ALJ "must articulate specific reasons for discounting a claimant's testimony as being less than credible."). Factors that should be considered include the objective

medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A reviewing court must be mindful that reversal on this ground is appropriate only if the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14.

Pulaski first claims that the ALJ used boilerplate language to state his credibility decision. The ALJ began with a template frequently used in cases of this type to announce a credibility decision: "the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 33.) The Court agrees that this language is insufficient to assess Pulaski's credibility. The first part of the ALJ's language has been criticized as not just boilerplate, but "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). The Seventh Circuit has recently rejected the second half of the ALJ's language on the ground that "the boilerplate implies that the determination of credibility is deferred until the ability to work is assessed without regard to credibility, even though it often can't be." *Bjornson v. Astrue*, 672 F.3d 640, 645-46 (7th Cir. 2012). As *Bjornson* makes clear, a claimant's ability to work is frequently dependent on the credibility of her statements, and an ALJ's implication that the RFC can be decided first "gets things backwards." *Id*. at 645.

That said, the ALJ did not leave his credibility analysis to such form language. He also considered a variety of factors required for assessing credibility under SSR 96-7p. The ALJ first cited a variety of medical facts to discount Pulaski's credibility, including evidence that she had suffered a leg fracture with irreversible nerve damage, had severe muscular atrophy, a shorter left leg, and experienced weakness that resulted from her muscle and nerve problems. The ALJ's reliance on these facts is problematic because, on their face, they appear to confirm, rather than contradict, the symptoms Pulaski described at the hearing. However, the ALJ did not provide any explanation of why he believed the medical record should be interpreted as at odds with the hearing testimony.

Such a consideration of the record does not comply with the directives of SSR 96-7p. The ALJ concluded that the "[o]bjective medical evidence does not fully support the claimant's complaints." This reasoning, however, applies an incorrect legal standard to a credibility assessment. Social Security Ruling 96-7p states that the medical evidence is "a useful indicator" to assist an ALJ in evaluating a claimant's condition, but the intensity of a claimant's alleged symptoms cannot be rejected on the ground that the record does not entirely support a claimant's statements. SSR 96-7p ("However, allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence.") (emphasis omitted). Indeed, if a claimant's statements were in full accord with the medical record, the ALJ would not be required to consider the claimant's credibility at all. As SSR 96-7p states, an ALJ only assesses credibility when the alleged symptoms "are not substantiated by objective medical evidence." SSR 96-7p.

The ALJ also provided no reasoning to support his conclusion. It is entirely unclear, for example, why Pulaski's testimony should be discounted based on the fact that she has irreversible nerve damage and muscle weakness. Without giving any explanation of how the medical record undermined Pulaski's testimony, the ALJ failed to "build a logical bridge between the evidence and his conclusion" that Pulaski's statements were not credible. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Commissioner makes some effort to defend the ALJ's reasoning by claiming that he correctly relied on inconsistencies between Pulaski's testimony and the record. For example, the Commissioner points to the fact that the ALJ concluded that no significant record evidence exists concerning Plaintiff's complaints about her alleged hip or shoulder pain. But such evidence was clearly available for the ALJ to consider. After she was referred to physical therapy, Pulaski reported that her "chief complaint is left intrascapular pain that is constant burning and can reach a 7 out of 10." (R. 284.) Dr. Hafezi's initial evaluation also reported that she complained of a sharp pain in the scapular area and in her right buttock, apparently meaning her right hip area. (R. 321.)

Social Security Ruling 96-7p requires an ALJ to consider the medication a claimant takes to control pain and the side effects associated with the medication. The ALJ did so in this case by noting that Pulaski only took over-the-counter medications after her initial onset date, and later took Lyrica and Vicodin in "dosages that are not extraordinary." (R. 34.) Pulaski objects that such a finding constitutes a prohibited medical determination by the ALJ that requires reversal. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (holding that an ALJ may not "play doctor" and reach his own medical conclusions). This claim is not entirely persuasive

because SSR 96-7p specifically directs an ALJ to consider the dosage levels of a claimant's medication. Notwithstanding, the ALJ's conclusion remains problematic. The ALJ's criticism of the dose of Vicodin prescribed to Pulaski is misdirected because that drug only comes in one dosage level – the 500 mg. Pulaski took. *Physicians Desk Reference* 304 (66th ed. 2012). As for Lyrica, the ALJ had no basis to conclude that the dose prescribed to Pulaski showed that her subjective statements were not credible without first obtaining medical information concerning her prescription. Pulaski complained, for example, of significant drowsiness stemming from Lyrica, which she took in tandem with a narcotic pain medication. Drug interactions, or other medical concerns, could have been as much at play in the dose of Lyrica given to Pulaski by her physician as the ALJ's assumption that she did not experience significant pain.

Pulaski testified in some detail that her medication, especially Lyrica, made her drowsy and required her to take naps throughout the day. (R. 54.) The Commissioner claims that the ALJ properly considered this allegation because he noted her testimony, but found that she also stated that she tries to take Lyrica in the evening. The Court finds this unconvincing. The ALJ's decision merely restates Pulaski's own testimony on this issue instead of assessing its credibility. The Commissioner's argument fails to address the fact that Pulaski essentially claimed that she must take naps during the day *despite* the fact that she takes Lyrica at night, not that taking it in the evening solved her problem. Insofar as the ALJ discounted Pulaksi's claims of sleepiness because he believed that taking Lyrica at night would prevent daytime drowsiness, he did not note any medical evidence that supported such an assumption.

The Commissioner is on firmer ground by arguing that the ALJ correctly found that Pulaski had received conservative treatment for her pain. The fact that a claimant has been

prescribed only conservative treatment is a ground for finding that her allegations concerning pain and other limiting factors are not entirely credible.  *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that a claimant's testimony was not fully credible when treatment was "routine and conservative"); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009).  Pulaski objects that the ALJ had no ground for making such a finding, but her treating physician specifically recommended that she continue with the "conservative management" that had been applied to her complaints.  (R. 219.)  This included physical therapy instead of surgery, and at one point, over-the-counter medications instead of prescription drugs to treat her pain.[4]

As the Commissioner also notes, the ALJ correctly found that the record did not suggest that Pulaski suffered from extreme pain.  Dr. Hafezi noted in his initial meeting with Pulaski that despite her physical limitations, pain did not restrict her ability to stand or walk.  He stated: "She is not in severe pain, per se, as much as she is concerned about feeling uncomfortable when standing and walking for long periods of time."  (R. 261.)  The problem with the ALJ's finding on this issue is that he failed to indicate why Dr. Hafezi's comments provided a basis to discount Pulaski's testimony, or what portion of her statements were made less credible by her treating physician's notes.  Contrary to what the ALJ appears to have assumed, Pulaski did not testify that she suffered from severe pain; she stated that her pain was "tolerable" with medication.  (R. 48.)

_____

[4] Along these lines, Plaintiff also testified that Dr. Hafezi determined that she needed a leg brace because she has significant difficulty in moving her leg forward, and that she falls on occasion.  The ALJ noted that Plaintiff had recently been fitted for a brace to improve her walking, but he appears to have brushed aside its significance by stating that "Dr. Hafezi noted in June 2007, that at that time, she was able to ambulate effectively without any assistive devices."  (R. 34.)  However, it is not self-evident why the fact that Pulaski could walk without a brace in 2007 is relevant to her condition in 2009, given that her treating physician deemed it necessary at that time.  On remand, the ALJ shall consider how Pulaksi's need for a brace affects the credibility of her statements.

- 15 -

This is, in fact, largely what Dr. Hafezi's notes reflect.  Indeed, Pulaski echoed Dr. Hafezi's remark that she was "uncomfortable" by stating that she was "always discomfort," not that she experienced crippling pain.  (R. 49.)  She also confirmed the record evidence concerning her physical therapy by stating that daily therapy exercises loosened her muscles and "help me to get rid of the pain somehow."  (R. 50.)  If the ALJ believed that the record showed that some of Pulaski's other testimony concerning her pain was not entirely credible, he was required to explain what those statements were and the basis for his reasoning.

For these reasons, the Court finds that the ALJ failed to adequately explain the reasons for assessing Pulaski's credibility and did not build a logical bridge between the evidence and his conclusions.

### B.  Dr. Hafezi's Opinion

Pulaski also contends that the ALJ failed to adequately explain why he did not give controlling weight to the RFC opinion of her treating physician, Dr. Hafezi.  A treating physician's opinion is entitled to controlling weight when it is supported by the objective medical record and is not inconsistent with other substantial evidence.  20 C.F.R. § 414.1527(d)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).  Even when an ALJ finds that a treating physician's report is not entitled to controlling weight, the ALJ may not simply reject the report or opinion out of hand.  SSR 06-2p.  Instead, he must determine the weight that should be assigned to the report by discussing the length, nature, and extent of the treating relationship; the supporting evidence in the record; the consistency of the opinion with the record, and the physician's medical speciality.  20 C.F.R. § 404.1527(d).  Social Security Ruling  96-2p makes

clear that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Whatever his decision, the ALJ must provide "good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).

On December 3, 2009, Dr. Hafezi completed a RFC Questionnaire concerning Pulaski. He concluded, in relevant part, that she could stand for a total of two hours during an eight-hour day, walk for one hour, and sit for five hours. However, she was only able to sit for three hours at a single stretch, stand for one hour, and walk for thirty minutes at a time. Dr. Hafezi also noted numerous restrictions in her ability to move, including no capacity to squat, crawl, climb, reach, stoop, crouch, or kneel. He found that Pulaski's pain level was "moderate." (R. 400-01.) The ALJ concluded that Dr. Hafezi's RFC Questionnaire should be given "significant" weight, in part, because some of his findings conflicted with his earlier 2007 RFC assessment. The ALJ also took significant exception with the fact that Dr. Hafezi did not explain his reasons for the 2009 RFC conclusions. Finally, the finding of moderate pain was rejected because it "does not appear to contemplate the pain level after medication." (R. 34.)

The Court agrees with Pulaski that the ALJ failed to provide "good reasons" for the weight given to Dr. Hafezi's opinion. 20 C.F.R. § 404.1527(d)(2). The ALJ's basis for rejecting Dr. Hafezi's conclusion concerning pain is groundless, as nothing in the RFC Questionnaire suggests that the physician did, or did not, consider Pulaski's post-medication pain. Nor did the ALJ have any basis for rejecting the treating physician's opinion that Pulaski should be protected from fumes, gas, and noise. (R. 34.) The ALJ stated that this restriction failed to reflect Plaintiff's leg weakness, but the record is also replete with her complaints of chronic headaches.

(R. 258, 298.)  Dr. Hafezi may have considered headaches, or any number of other medical reasons, as a basis for making his RFC determination, and the ALJ was not entitled to make an independent decision on this matter based on his own interpretation of her medical condition.

More importantly, the ALJ simply failed to provide any reasonable ground for rejecting significant portions of Dr. Hafezi's opinion.  The fact that the treating physician's 2009 RFC differed from his 2007 RFC is not, in itself, a proper basis for doing so.  Two years separate the reports, and the ALJ had no reason to assume that Pulaski's medical condition did not change during that period.  At a minimum, the ALJ was required to explain why the two RFC assessments could be seen in tandem with one another, and not as two distinct sets of findings that reflect Pulaski's medical condition at different times.  The ALJ himself implicitly noted that her condition appeared to have changed between 2007 and 2009; he stated that she was able to walk effectively without an assistive device in 2007, but that Dr. Hafezi had prescribed a leg brace by 2009.  (R. 34.)  Pulaski was also not taking prescription pain medication when she first consulted Dr. Hafezi on June 27, 2007, but she was taking Vicodin and Lyrica by the time of the hearing on December 9, 2009.  These facts presumably suggest a change in Pulaski's condition from the time of Dr. Hafezi's first RFC to the 2009 assessment.

Moreover, the ALJ's reliance on the fact that Dr. Hafezi did not explain his reasons for the RFC findings is seriously at odds with itself and the ALJ's conclusions concerning other evidence.  The ALJ rejected a number of the treating physician's findings because Dr. Hafezi did not explain his reasons for making those specific determinations.  But Dr. Hafezi's report does not explain the basis for *any* of his conclusions, and each finding suffers from the same alleged deficiency cited by the ALJ.  Despite this, the ALJ gave the report "significant" weight and

apparently adopted into his RFC, *inter alia*, Dr. Hafezi's conclusions that Pulaski could stand for two hours during a workday and lift up to ten pounds frequently. (R. 32.) If the ALJ actually believed that the lack of an explanation justified rejecting some of Dr. Hafezi's findings, then he should either have rejected the 2009 RFC in its entirety, or explained why some conclusions were more acceptable than others.

The Court notes in this regard that the ALJ also gave "significant" weight to the RFC assessment of the state agency reviewing physician, Dr. Padma Talcherkar. The Commissioner correctly notes that the ALJ adopted some of Dr. Talcherkar's findings that conflicted with Dr. Hafezi's. The RFC Assessment form Dr. Talcherkar used for her findings includes a section requiring the state agency physician to explain "how and why the evidence supports your conclusion." (R. 301-02.) Like Dr. Hafezi, Dr. Talcherkar provided no explanation for her findings. If the ALJ believed that some of Dr. Hafezi's conclusions should be rejected for the lack of an explanation, he was required to explain why Dr. Talcherkar's conclusions could be adopted when they suffered from the same alleged shortcoming. The ALJ noted that Dr. Talcherkar had made a "comprehensive review of the record." (R. 34.) But as Dr. Hafezi was familiar with Pulaski herself, the ALJ could not merely rely only on that fact alone.

For these reasons, the ALJ did not provide good reasons for the weight he gave to Dr. Hafezi's RFC questionnaire, and he failed to build a logical bridge between the record and his conclusion on this issue. On remand, the ALJ shall clearly indicate what portions of these physician's reports he relied on in assessing the RFC, and shall provide appropriate reasons for assigning weights to those reports.

### C.     The RFC Issue

Finally, PULASKI argues that the ALJ did not properly determine her RFC or state his reasons for assessing her limitations.  The RFC measures what work-related activities a claimant can perform despite her limitations.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  An ALJ must consider all the evidence in the record including the claimant's medical history, daily activities, medical source statements, and lay reports.  SSR 96-8p.  Both medical and non-medical evidence are important in determining RFC because, although the RFC is a legal decision for the ALJ to make, he may not do so without an adequate evidentiary basis.  *See Diaz*, 55 F.3d at 306 n.2.  In addition, SSR 96-8p requires an ALJ to provide a narrative discussion on how the evidence supports each of the RFC conclusions and how the claimant is able to sustain "work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent schedule)."  SSR 96-8p.

Unfortunately, ALJ Marcus did not follow these guidelines.  He claimed that his credibility analysis provided the primary support for the RFC determination, but that analysis is flawed for the reasons discussed above.  In particular, the ALJ's failure to assess the credibility of Pulaski's statements concerning her drowsiness and her need for naps is at odds with a finding that she is able to sustain her work activities on a "continuing basis."  SSR 96-8p.  The Commissioner notes that Dr. Hafezi concluded that Pulaski could work for eight hours a day. However, the ALJ gave no indication that he credited the treating physician on this conclusion, which is as unexplained as those portions of Dr. Hafezi's report that the ALJ rejected because they lacked any explanatory reasoning.

The ALJ also failed to adequately explain what medical evidence supported his RFC findings. The Commissioner claims that the ALJ relied on Dr. Talcherkar's RFC assessment. But the ALJ made no attempt to indicate what parts of Dr. Talcherkar's assessment he adopted, or his reasons for doing so. The issue is critical under these facts because the ALJ clearly rejected several of Dr. Talcherkar's central conclusions by constructing a RFC at odds with them. For example, the state agency physician believed that Pulaski could stand and walk for six hours a day (R. 301); the ALJ limited her to only two hours. Dr. Hafezi's RFC does not help in this regard because the ALJ clearly rejected his opinion that Pulaski could only walk for one hour each day. (R. 400.) Having set aside both physicians' opinions on this issue, the ALJ had no remaining medical evidence to support his RFC. *See Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a middle ground RFC without a proper medical basis.") (internal quote and citation omitted). Even assuming an ALJ can do so, as the Commissioner claims, he was still required to explain the reasons for his finding and to build a logical bridge from the record to his RFC conclusions. *See* SSR 96-8p (stating that the ALJ must always provide a narrative discussion linking the record to the RFC findings).

The problem is compounded in this case because the ALJ's RFC also appears to be an amalgamation of various findings by Dr. Talcherkar and Dr. Hafezi, whose conclusions concerning Pulaski's exertional abilities were not in complete agreement. For example, Dr. Hafezi found that Pulaski could never kneel, crouch, or crawl; Dr. Talcherkar found that she could do so on occasion. The ALJ rejected Dr. Hafezi's conclusion because it was not explained, but appears to have adopted Dr. Talcherkar's even though it was equally unexplained. As such, the ALJ made no attempt to explain how "material inconsistencies or ambiguities in the evidence

in the case record were considered and resolved." SSR 96-8p. The Court agrees with the Commissioner that an ALJ is not required to mirror a medical report in fashioning an appropriate RFC. But he may not merely construct his own RFC without explaining how the medical and non-medical evidence supports his conclusions. ALJ Marcus did so in this case, and he failed to build a logical bridge between the record and his RFC conclusions.

## V. <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted. Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

**Dated:** May 25, 2012.                                United States Magistrate Judge